FILED
NOV - 6 2006
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Case 1:06-cv-01892-CKK-JMF   Document 1   Filed 11/06/2006   Page 1 of 18

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Covad Communications Company<br>110 Rio Robles<br>San Jose, California 95132-1813<br><br>        Plaintiff,<br><br>v.<br><br>Revonet, Inc.<br>125 Elm Street<br>New Canaan, Connecticut 06840<br><br>        Defendant. | Case No. _____<br><br>CASE NUMBER 1:06CV01892<br>JUDGE: Colleen Kollar-Kotelly<br>DECK TYPE: Contract<br>DATE STAMP: 11/⬛/2006<br><br>JURY ACTION |

## COMPLAINT

Plaintiff Covad Communications Company ("Covad"), by its attorneys, in support of its Complaint against Defendant Revonet, Inc. ("Revonet"), alleges as follows:

### NATURE OF THE ACTION

1. This is an action by Covad against Revonet resulting from Revonet's misappropriation of Covad's proprietary, confidential and trade secret information. Covad contracted to use Revonet's sales information, products and services as part of Covad's extensive marketing efforts to identify businesses suitable for Covad's Voice over Internet Protocol ("VoIP") services. Given the nature of Revonet's services, Covad authorized Revonet to access Covad's proprietary, confidential and trade secret customer lead information, but only after Revonet executed a confidentiality agreement promising to safeguard Covad's information. Without Covad's knowledge or consent, and in violation of its confidentiality agreement, Revonet launched a full scale effort to take for itself Covad's commercially valuable customer lead information and enhance Revonet's own database of potential customers. Revonet then sold

1

this information to its other customers, including Covad's direct competitors XO Communications and CallTower, Inc.

2. Revonet's actions were calculated to deprive Covad of the fruits of its substantial investment in developing valuable customer lead information to achieve success in the highly competitive VoIP market. Covad's complaint seeks to remedy Revonet's unauthorized use and disclosure of Covad's proprietary, confidential and trade secret information, as well as Revonet's abuse of the trust and confidence that Covad placed in Revonet to safeguard Covad's valuable information.

## PARTIES

3. Covad is a California corporation with its principal place of business in San Jose, California.

4. Revonet is a Delaware corporation with its principal place of business in New Canaan, Connecticut.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a) because there is complete diversity between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6. This Court has personal jurisdiction over Revonet under D.C. Code § 13-423 because Revonet conducts substantial, continuous and systematic general business in the District of Columbia. Revonet, moreover, expressly agreed that the courts in the District of Columbia would have personal jurisdiction over Revonet to adjudicate any dispute relating to Revonet's breach of confidentiality or any other misuse of Covad's intellectual property.

7.  Venue is appropriate in this district under 28 U.S.C. § 1391(a) and also because Revonet expressly agreed to adjudicate disputes concerning violations of the confidentiality agreement in the District of Columbia.

## FACTS

### Covad's VoIP Services And Its VoIP Marketing Campaign.

8.  Covad was founded in 1996. It is a leading provider of integrated voice and data communications for small and medium-sized businesses. Since its inception, Covad's business and customer base have grown significantly. In 1999, Covad launched the nation's first Digital Subscriber Line ("DSL") service alternative to local phone companies. By 2000, Covad had 100,000 DSL lines in service. By 2003, Covad had over 500,000 DSL lines in service.

9.  In 2004, Covad acquired GoBeam, Inc. ("GoBeam"), a provider of VoIP solutions to small and medium-sized businesses. With this acquisition, Covad launched its VoIP capabilities and initiated an aggressive expansion of VoIP services in major metropolitan areas nationwide.

10. Covad invested millions of dollars in a marketing campaign designed to generate interest in Covad's VoIP services, and to identify likely customers for Covad's VoIP business. This marketing campaign consisted of major advertising efforts, including television, Internet and print advertisements, to generate contact information from prospective customers of VoIP services. The information associated with these prospective customers is known as customer leads. To capture the customer leads developed through its marketing campaign, Covad used toll free phone numbers and websites.

11. Covad's VoIP marketing campaign proved extremely successful. It generated significant interest in Covad's VoIP services and attracted large volumes of phone calls and e-

mails from businesses interested in VoIP services. The potential customer information generated through these phone calls and e-mails was the direct result of Covad's extensive marketing campaign. The customer lead information derived from Covad's marketing campaign was commercially valuable, particularly in view of the highly competitive nature of the VoIP market. Because customer lead information was critical to Covad's growth in the VoIP market, Covad invested heavily in (a) the marketing campaign to generate customer leads; (b) its efforts to identify those potential customers best suited for Covad's services and to follow-up with those customers; and (c) its efforts to maintain the confidentiality of the customer lead information Covad developed.

### Covad's June 2004 Contract With Revonet.

12. Covad entered into a contract with Revonet for customer lead generation services in June 2004 (the "June 2004 Contract."). Pursuant to the June 2004 Contract and its amendments, Revonet agreed to provide Covad with "inbound" and "outbound" customer lead generation services.

13. As part of the "inbound" lead generation services, Revonet agreed to assist Covad in obtaining business from the customer leads developed through Covad's VoIP marketing campaign. For example, Revonet agreed to screen and follow up with Covad's customer leads in an effort to convert these leads into actual customers. To allow Revonet to screen these leads, Covad entrusted Revonet with full access to its valuable customer lead information captured from Covad's websites and toll free numbers.

14. As part of the "outbound" lead generation services, Revonet agreed to provide Covad with customer leads – separate and independent from the "inbound" leads – by matching

Covad's stated customer criteria with Revonet's "Federated Database." Revonet also agreed to follow up with the outbound customer leads to offer Covad's VoIP and other services.

15. Revonet touted its Federated Database as a commercially valuable listing of credible customer leads in the telecommunications field. Based upon Revonet's representations, Covad reasonably expected the Federated Database to be another source of customer leads, separate and apart from the inbound leads developed through Covad's marketing campaign. Revonet views the customer lead information in its Federated Database as trade secrets of Revonet, in addition to information that is confidential and proprietary to Revonet. Covad would later learn that – after paying a substantial premium – many of the customer leads derived from Revonet's Federated Database were not legitimate, and that the database actually included leads that Covad had generated and Revonet misappropriated so that Revonet could enhance its database at Covad's expense.

**The Parties' Confidentiality Agreement To Safeguard Proprietary Information.**

16. To safeguard each others' commercially valuable information, Revonet and Covad executed a "Mutual Confidentiality and Data Use Agreement" (the "Confidentiality Agreement"). A true copy of the Confidentiality Agreement is attached as Exhibit A (Plaintiff is not attaching the other contracts alleged herein due to confidentiality concerns. Plaintiffs will submit the other contracts to the Court at an appropriate time after conferring with counsel for Defendant). The Confidentiality Agreement provides, in part, that:

> [Covad] is the sole and exclusive owner of all of its information delivered by [Covad] to Revonet, including without limitation its customer lists, target information and business sales and marketing plans (the "Client Information"). The Client Information is deemed "Confidential Information" under Section 2.

The June 2004 Contract incorporated the terms and conditions of the Confidentiality Agreement.

5

17.  To clarify each party's obligations to safeguard proprietary information, the parties further agreed as follows:

> [e]ach party may disclose confidential or proprietary information about its business or products ("Confidential Information") to the other party. Each party will maintain the other party's Confidential Information in strict confidence and treat the other party's Confidential Information with at least the same degree of care that it treats its own confidential information. Subject to this Section 2, *neither party will disclose the other party's Confidential Information to any person, except its directors, officers, employees, contractors and agents (collectively, "Representatives") who need to know such information and are bound by similar confidential obligations*.... Notwithstanding the above, [Covad] acknowledges that Revonet is in the business of developing and providing proprietary data products (such as market research reports and sales leads) for its clients. Therefore, [Covad] acknowledges that [Covad] Information provided by [Covad] consisting solely of customer lists, transaction data and related information, may be incorporated and used in such data products as long as it is used only in an aggregate manner, does not contain personally identifiable information and [Covad] is not identified as the source of such data. Revonet agrees that the list of sales leads contained in the Work Product provided to [Covad] will not be given by Revonet to third parties, although the foregoing will not restrict Revonet from re-generating or identifying any such leads from Revonet's databases or third party sources in connection with services requested by such third parties (in which case the sales leads will be deemed part of a different list). (emphasis added)

18.  Recognizing that the unauthorized disclosure of confidential information could cause competitive harm, the parties further agreed as follows:

> [e]ach party acknowledges that the unauthorized use or disclosure of the disclosing party's Confidential Information may cause the disclosing party to incur irreparable harm and significant damages, the degree of which may be difficult to ascertain. Accordingly, each party agrees that the disclosing party will have the right to seek immediate equitable relief to enjoin any unauthorized use or disclosure of its Confidential Information, in addition to any other rights and remedies that it may have at law or otherwise.

19.  The parties also agreed that the Confidentiality Agreement "shall be interpreted and enforced in accordance with the laws of the State of California without regard to conflicts of law principles thereof...."

6

20.     From time to time, the June 2004 Contract was amended to further define the inbound and outbound customer lead generation services. None of the amendments altered the parties' obligations under the Confidentiality Agreement.

21.     The lead generation services that Revonet provided came at a significant cost. As part of the June 2004 Contract, Covad agreed to pay Revonet between $200,000 and $400,000 per month for outbound lead generation services. Covad also agreed to pay $4,800 per month per each Revonet representative dedicated to provide inbound lead generation services. Moreover, Covad paid $140,000 in "set up" fees and also paid $125,000 for a survey of the marketplace that Revonet created to allow Covad to better grow its business. Based on these costs, Covad expected significant results from Revonet to improve Covad's VoIP business and further expected that its valuable information would be safeguarded.

### Covad's June 2005 Contract With Revonet.

22.     In June 2005, Revonet entered in a new agreement with Covad for inbound and outbound lead generation services ("the June 2005 Contract"). This June 2005 Contract, like the June 2004 Contract, incorporated the Confidentiality Agreement.

23.     Consistent with the terms of the June 2005 Contract, Covad paid a substantial premium for the inbound and outbound lead generation services that Revonet provided. For example, Covad agreed to pay $340,000 per month for outbound lead generation services. Covad also agreed to pay $24,000 per month for four (4) dedicated representatives to provide inbound lead generation services. Moreover, Covad agreed to pay $100,000 per month for a fixed number of customer attended appointments to close on a deal. Again, Covad had high expectations for the lead generation services that Revonet was set to provide.

### Covad's January 2006 Contract With Revonet.

24.     Covad paid substantial sums to Revonet under the June 2004 and June 2005 contracts. By late 2005, Covad paid Revonet millions of dollars for inbound and outbound lead generation services that Revonet had agreed to provide. Although Revonet gave Covad high hopes for Revonet's outbound lead generation services through leads derived from Revonet's Federated Database, many of the leads for which Covad paid a premium did not develop into the VoIP business that Covad had expected. Covad was disappointed with the results of the outbound services that Revonet had provided.

25.     As a result, in January 2006, Covad entered into a new contract with Revonet for inbound and outbound customer lead generation services (the "January 2006 Contract"). The January 2006 Contract was more performance-oriented than the June 2004 and June 2005 Contracts. By way of example, Covad agreed to pay a set fee for customer attended appointments to close on a deal for Covad services. The January 2006 Contract significantly reduced the outbound services that Revonet was set to provide.

26.     Like the June 2004 and June 2005 Contracts, the January 2006 Contract incorporated the Confidentiality Agreement. Accordingly, Revonet was under a continuing obligation to maintain the confidentiality of Covad's proprietary, confidential and trade secret information.

### Revonet Breaches Its Confidentiality Obligations Pursuant To The June 2004, June 2005 And January 2006 Contracts.

27.     Based on the plain language of the June 2004, June 2005 and January 2006 Contracts, Covad understood, expected, and relied upon Revonet's promise that it would maintain the confidentiality of Covad's proprietary, confidential and trade secret information. At no time did the parties agree that Covad's proprietary, confidential and trade secret customer

lead information – which was derived at a substantial expense from Covad's VoIP advertising and marketing campaign – could be integrated wholesale into Revonet's Federated Database for sale to third parties, including Covad's competitors.

28. Pursuant to the parties' contracts and the confidentiality provisions thereof, Covad granted Revonet full access to Covad's secure databases that contained the customer lead information derived from the VoIP advertising campaign and other sources. Covad also allowed Revonet representatives to field the phone calls from the inbound customer leads that Covad's marketing campaign generated.

29. Covad is informed and believes, and on that basis alleges, that Revonet took Covad's proprietary, confidential and trade secret inbound customer lead information derived from Covad's advertising campaign and integrated this information into Revonet's Federated Database in violation of the parties' June 2004, June 2005, and January 2006 Contracts. Covad is informed and believes, and on that basis alleges, that Revonet instructed its information technology employees to access and integrate Covad's inbound customer lead information into Revonet's Federated Database on a nightly basis. At no time did Covad authorize Revonet to take such action.

30. Covad is informed and believes, and on that basis alleges, that Revonet improperly usurped Covad's proprietary, confidential and trade secret customer lead information and added Covad's proprietary VoIP customer leads to Revonet's Federated Database of VoIP leads. Based on previous dealings, Covad is informed and believes that prior to its misappropriation of Covad's sales leads, Revonet was having difficulty generating its own leads for its Federated Database. For example, many of the leads that Revonet provided from its Federated Database (*i.e.*, outbound customer leads) did not materialize into legitimate customer

leads as Revonet led Covad to believe. Covad is informed and believes, and on that basis alleges, that Revonet sought to enhance its Federated Database of potential VoIP customers by incorporating sales leads it took from Covad instead of investing its own time or resources to develop these leads.

31.     Covad is informed and believes, and on that basis alleges, that Revonet felt significant pressure to deliver legitimate leads as part of its outbound services to Covad and, therefore, sought to enhance its Federated Database by using Covad's customer leads Covad provided to Revonet.

32.     Covad is informed and believes, and on that basis alleges, that Revonet used Covad's proprietary, confidential and trade secret customer lead information derived from Covad's advertising campaign and shared this information with third parties, including Covad's competitors, XO Communications and CallTower, Inc. Covad is informed and believes, and on that basis alleges, that Revonet provided Covad's customer leads to Covad's competitors by taking those leads from its Federated Database, which – due to Revonet's breach of confidentiality – included Covad's proprietary, confidential and trade secret customer lead information.

33.     Covad is informed and believes, and on that basis alleges, that Revonet also sold Covad's proprietary, confidential and trade secret customer leads to Covad's competitors, including XO Communications and CallTower, Inc., for monetary gain. Covad is informed and believes, and on that basis alleges, that Revonet integrated Covad's inbound customer leads into its Federated Database in violation of the parties' contracts, and then generated outbound leads for its other customers – including Covad's direct competitors such as XO Communications and CallTower, Inc. As a result, Covad is informed and believes, and on that basis alleges, that

Covad has lost significant business to its competitors due to Revonet's conduct in selling Covad's proprietary, confidential and trade secret customer information to Covad's competitors in violation of the parties' contracts.

34.     Covad is informed and believes, and on that basis alleges, that Revonet is continuing to use Covad's proprietary, confidential and trade secret customer information without authorization and in violation of the parties' June 2004, June 2005 and January 2006 Contracts. Covad is further informed and believes, and on that basis alleges, that Revonet misappropriated Covad's customer lead information even after Covad terminated the January 2006 Contract.

### Covad Terminates Its Contract With Revonet.

35.     Covad terminated its January 2006 contract with Revonet on May 15, 2006 by providing formal notice in accord with the terms of that contract.

36.     Apart from the formal notice of termination, Covad has also requested that Revonet cease and desist from any ongoing disclosure of Covad's confidential information to third parties, including Covad's competitors. Moreover, Covad has requested that Revonet return all customer lead information that Covad had provided to Revonet dating back to June 2004 and to destroy any remaining copies of this information. Revonet disregarded these requests.

### COUNT I

### BREACH OF CONTRACT

37.     Covad realleges and incorporates herein by reference the allegations of paragraphs 1 through 36 set forth above.

38. Covad and Revonet entered into agreements for customer lead generation services in June 2004, June 2005 and January 2006.

39. In each of these contracts, Revonet agreed, *inter alia*, that it would not disclose Covad's proprietary, confidential and trade secret customer lead information to third parties, including Covad's competitors.

40. Covad has performed all conditions, covenants and promises required to be performed by it in accordance with the terms and conditions of the June 2004, June 2005 and January 2006 Contracts.

41. Covad is informed and believes, and on that basis alleges, that Revonet breached the June 2004, June 2005 and January 2006 Contracts by integrating Covad's proprietary, confidential and trade secret customer lead information into Revonet's Federated Database without authorization. Revonet further breached the parties' contracts by disclosing Covad's proprietary, confidential and trade secret information and selling the same for Revonet's own monetary gain to unauthorized parties, including Covad's competitors.

42. As a proximate result of Revonet's breach of the June 2004, June 2005 and January 2006 Contracts, Covad has suffered damages in an amount to be determined at trial but in no event less than $8,000,000.00.

## COUNT II

### MISAPPROPRIATION OF TRADE SECRETS

43. Covad realleges and incorporates herein by reference the allegations of paragraphs 1 through 42 set forth above.

44. Covad's customer lead information constitutes trade secrets. The customer lead information described in the above paragraphs, had and has economic value, both actual and

potential, was derived through substantial effort and expense, is not known to others, and is not readily ascertainable through proper means. At all times relevant hereto, Covad has made, and continues to make, reasonable efforts to ensure that Covad's trade secret information remains confidential.

45. Covad is informed and believes, and on that basis alleges, that Revonet has misappropriated Covad's trade secret information by using and disclosing such information to third parties, including Covad's direct competitors. By virtue of the acts and omissions of Revonet, the actual and threatened misappropriation and misuse of Covad's information is within the meaning of the California Uniform Trade Secrets Act, which the parties agreed would apply.

46. As a proximate result of Revonet's misappropriation of trade secrets, Covad is informed and believes, and on that basis alleges, that Revonet both profited by selling Covad's trade secrets and caused Covad to lose business. As a result, Covad has suffered damages in an amount to be determined at trial but in no event less than $8,000,000.00.

47. Revonet's wrongful conduct in misappropriating Covad's trade secrets, unless and until enjoined and restrained by order of this Court, will cause great and irreparable injury to Covad's business and Covad will lose business and lose the utility and secrecy of its valuable information.

48. Covad is informed and believes, and on that basis alleges, that there is actual and threatened misappropriation and misuse of Covad's trade secret information by Revonet. Covad has no adequate remedy at law for the injuries currently being suffered and which are threatened in that Revonet will continue to misappropriate and misuse Covad's valuable information and render any judgment ineffectual. Covad also has no adequate remedy at law because pecuniary compensation will not afford sufficient relief to Covad and because it will be extremely difficult

to ascertain the amount of compensation that would afford such relief. Therefore, Covad is entitled to injunctive relief afforded by the California Uniform Trade Secrets Act.

49. Based on the conduct described above, Covad is informed and believes, and on that basis alleges, that Revonet willfully and maliciously misappropriated Covad's trade secrets. As a result, Covad is also entitled to an award of exemplary damages in an amount appropriate to punish Revonet for its conduct.

## COUNT III

## BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

50. Covad realleges and incorporates herein by reference the allegations of paragraphs 1 through 49 set forth above.

51. The June 2004, June 2005 and January 2006 Contracts between Covad and Revonet each contained an implied covenant of good faith and fair dealing. That covenant required Revonet not to act in such a manner as to deprive Covad of the benefits owed to it under these contracts.

52. Revonet breached the June 2004, June 2005 and June 2006 Contracts by failing to safeguard the confidentiality of Covad's proprietary and confidential customer lead information as required under the terms of the June 2004, June 2005 and January 2006 Contracts, including disclosing Covad's proprietary, confidential and trade secret information to unauthorized third parties. Covad is informed and believes, and on that basis alleges, that Revonet breached the parties' agreement in an effort to enhance its own database of potential VoIP customers and then sell Covad's valuable information for Revonet's financial benefit.

53. Revonet's actions described hereinabove deprived Covad of the benefits owed to it under the June 2004, June 2005 and January 2006 Contracts.

54. Because of Revonet's breach of the covenant of good faith and fair dealing, Covad has sustained damages in an amount to be determined at trial but in no event less than $8,000,000.00.

## COUNT IV

## BREACH OF FIDUCIARY DUTY

55. Covad realleges and incorporates herein by reference the allegations of paragraphs 1 through 54 set forth above.

56. Covad disclosed its proprietary, confidential and trade secret customer lead information to Revonet in confidence and pursuant to agreed upon terms of the June 2004, June 2005 and January 2006 Contracts.

57. Revonet had access to Covad's proprietary, confidential and trade secret information on the understanding that it was not to be disclosed to others and was not to be used by them for any purpose beyond the limits of the confidence without Covad's permission.

58. Although Revonet was entitled to receive Covad's proprietary, confidential and trade secret information pursuant to the terms of the June 2004, June 2005 and January 2006 Contracts, Covad placed confidence in, and relied on, Revonet to maintain Covad's valuable information in the strictest confidence. Covad also relied on Revonet, as Covad's agent in carrying out the duties of the parties' contracts, to safeguard Covad's information and utilize it for the sole benefit of Covad. Based on this relationship of complete trust reposed on Revonet, Revonet owed a fiduciary duty to Covad to maintain and safeguard the confidentiality of Covad's proprietary, confidential and trade secret information.

59. Covad is informed and believes, and on that basis alleges, that, under California law, which the parties agreed would apply to this dispute, Revonet breached its fiduciary duty to

Covad by failing to maintain Covad's proprietary, confidential and trade secret information in the strictest confidence.

60. As a direct and proximate result of Revonet's breach of fiduciary duty, Covad has sustained and will continue to sustain damages. The precise nature and amount of such accrued and continuing damages is to be determined at trial but in no event is less than $8,000,000.00.

61. Covad is informed and believes, and on that basis alleges, that in committing the acts alleged herein, Revonet is guilty of oppression, fraud or malice in that it intentionally breached Covad's confidence and failed to maintain Covad's proprietary, confidential and trade secret information in strict confidence, entitling Covad to exemplary damages in an amount appropriate to punish Revonet for its conduct.

## COUNT V

## CONVERSION

62. Covad realleges and incorporates herein by reference the allegations of paragraphs 1 through 61 set forth above.

63. Covad is informed and believes, and on that basis alleges, that Revonet has improperly taken and converted Covad's proprietary, confidential and trade secret information for its use. Covad is further informed and believes, and on that basis alleges, that Revonet took Covad's valuable information and integrated it into Revonet's Federated Database without authorization and in breach of the parties' contracts. Covad is further informed and believes, and on that basis alleges, that Revonet misused Covad's proprietary, confidential and trade secret information and sold it to third parties, including Covad's competitors.

64. As a direct and proximate result of Revonet's conversion, Covad has sustained and will continue to sustain damages. The precise nature and amount of such accrued and continuing damages is to be determined at trial but in no event is less than $8,000,000.00.

65. Covad is informed and believes, and on that basis alleges, that in committing the acts alleged herein, Revonet is guilty of oppression, fraud or malice in that Revonet wrongfully and unlawfully usurped Covad's proprietary, confidential and trade secret information to benefit itself at Covad's expense. Covad is therefore entitled to payment of damages in a sum sufficient to punish Revonet, to set and example and to deter such conduct in the future.

## JURY DEMAND

66. Covad seeks a trial by jury on all triable issues.

## PRAYER FOR RELIEF

WHEREFORE, Covad prays as follows:

1. For damages according to proof at trial;

2. For exemplary damages in an amount sufficient to punish Revonet;

3. For the issuance of injunctive relief, enjoining Revonet, its agents and representatives, and all persons acting in concert or participating with it from using, publishing or disclosing, or authorizing others to use, publish or disclose, Covad's proprietary, confidential and trade secret information;

4. For a sum equivalent to the amount by which Revonet benefited, directly or indirectly, from the acts alleged, according to proof;

5. For costs of suit incurred herein;

6. For reasonable attorneys' fees; and

7. For such other and further relief as the court may deem just and proper.

                          Respectfully submitted,

                          _____
                          John A. Burlingame (DC Bar #455876)
                          *jburlingame@ssd.com*
                          SQUIRE, SANDERS & DEMPSEY L.L.P.
                          1201 Pennsylvania Avenue, NW
                          Suite 500
                          Washington, DC  20004
                          (202) 626.6600

# CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

## I (a) PLAINTIFFS
Covad Communications Company

## DEFENDANTS
Revonet, Inc.

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF    Santa Clara, CA
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

John A. Burlingame, Esq.
Squire, Sanders & Dempsey L.L.P.
1201 Pennsylvania Avenue, N.W.
P.O. Box 407
Washington D.C. 20044-0407

CASE NUMBER  1:06CV01892
JUDGE: Colleen Kollar-Kotelly
DECK TYPE: Contract
DATE STAMP: 11/ /2006

JURY ACTION

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

- ○ 1 U.S. Government Plaintiff
- ○ 3 Federal Question (U.S. Government Not a Party)
- ○ 2 U.S. Government Defendant
- ◉ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP FOR PLAINTIFF

|   | PTF | DFT |   | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ◉ 2 | ◉ 2 | Incorporated and Principal Place of Business in Another State | ◉ 5 | ◉ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

### ○ A. Antitrust
☐ 410 Antitrust

### ○ B. Personal Injury/Malpractice
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

### ○ C. Administrative Agency Review
☐ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

### ○ D. Temporary Restraining Order/Preliminary Injunction

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

### ○ E. General Civil (Other)    OR    ○ F. Pro Se General Civil

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant)
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food & Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act)

| ○ G. *Habeas Corpus/* *2255* ☐ 530 Habeas Corpus-General ☐ 510 Motion/Vacate Sentence | ○ H. *Employment Discrimination* ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation) *(If pro se, select this deck)* | ○ I. *FOIA/PRIVACY ACT* ☐ 895 Freedom of Information Act ☐ 890 Other Statutory Actions (if Privacy Act) *(If pro se, select this deck)* | ○ J. *Student Loan* ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |
|---|---|---|---|
| ○ K. *Labor/ERISA (non-employment)* ☐ 710 Fair Labor Standards Act ☐ 720 Labor/Mgmt. Relations ☐ 730 Labor/Mgmt. Reporting & Disclosure Act ☐ 740 Labor Railway Act ☐ 790 Other Labor Litigation ☐ 791 Empl. Ret. Inc. Security Act | ○ L. *Other Civil Rights (non-employment)* ☐ 441 Voting (if not Voting Rights Act) ☐ 443 Housing/Accommodations ☐ 444 Welfare ☐ 440 Other Civil Rights ☐ 445 American w/Disabilities-Employment ☐ 446 Americans w/Disabilities-Other | ⊙ M. *Contract* ☐ 110 Insurance ☐ 120 Marine ☐ 130 Miller Act ☐ 140 Negotiable Instrument ☐ 150 Recovery of Overpayment & Enforcement of Judgment ☐ 153 Recovery of Overpayment of Veteran's Benefits ☐ 160 Stockholder's Suits ☒ 190 Other Contracts ☐ 195 Contract Product Liability ☐ 196 Franchise | ○ N. *Three-Judge Court* ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**
⊙ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)
Breach of contract, misappropriation of trade secrets and breach of fiduciary duty

**VII. REQUESTED IN COMPLAINT** ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23   DEMAND $ $8,000,000.00   Check YES only if demanded in complaint
JURY DEMAND:   YES ☒   NO ☐

**VIII. RELATED CASE(S) IF ANY** (See instruction)   YES ☐   NO ☒   If yes, please complete related case form.

DATE 10.6.06   SIGNATURE OF ATTORNEY OF RECORD

---

INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.  CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.  CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the *primary* cause of action found in your complaint. You may select only *one* category. You *must* also select *one* corresponding nature of suit found under the category of case.

VI.  CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII. RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.