IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

COVAD COMMUNICATIONS COMPANY

     Plaintiff,

v.

REVONET, INC.

     Defendant.

Civil Court Action No:  1:06cv01892
Next Scheduled Event: Fact Discovery
Closes: 12/5/2007

## MOTION FOR JUDGMENT ON THE PLEADINGS PURSUANT TO RULE 12(C)

     COMES NOW Defendant Revonet, Inc. ("Revonet"), by undersigned counsel, and submits this Motion for Judgment on the Pleadings and states:

     1.    The Complaint in this matter filed by Covad Communications Company ("Covad") against Revonet, Inc. ("Revonet") fails as a matter of law.  The Mutual Confidentiality and Data Use Agreements, which were bargained for and entered into between Covad and Revonet in 2004, 2005 and 2006 expressly provide in unambiguous terms that Revonet can use the information obtained from Covad in the precise manner asserted in Covad's Complaint. Accordingly, Revonet is entitled to judgment as a matter of law on the frivolous Complaint filed by Covad.

     2.    Revonet adopts and incorporates the accompanying Memorandum as though fully set forth herein.

WHEREFORE, Revonet, Inc. respectfully moves this Court for an Order granting its Motion for Judgment on the Pleadings and for an award of attorney's fees and costs and such further relief this Court deems appropriate.

.

Respectfully submitted,

_/s/ Jennifer S. Jackman_____
Andrew J. Terrell (#431362)
Jennifer S. Jackman (#466922)
Kevin G. Hroblak, Esquire
Whiteford, Taylor & Preston L.L.P.
1025 Connecticut Avenue, NW
Washington, DC  20036-5405
(202) 659-6800

Attorneys for Defendant,
REVONET, INC.

## CERTIFICATE OF SERVICE

.

I HEREBY CERTIFY that on this 11th day of October, 2007, a copy of the foregoing was delivered by hand to:

John A. Burlingame
Squire, Sanders & Dempsey, LLP
1201 Pennsylvania Avenue, NW
Suite 500
Washington, D.C.  20004

_/s/ Jennifer S. Jackman_____
Jennifer S. Jackman

_207823_

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COVAD COMMUNICATIONS COMPANY | |
| Plaintiff, | |
| v. | Civil Court Action No: 1:06cv01892<br>Next Scheduled Event: Fact Discovery<br>Closes: 12/5/2007 |
| REVONET, INC. | |
| Defendant. | |

## MEMORANDUM IN SUPPORT OF REVONET, INC.'S
## MOTION FOR JUDGMENT ON THE PLEADINGS PURSUANT TO RULE 12(C)

COMES NOW Defendant Revonet, Inc. ("Revonet"), by undersigned counsel, and submits this Memorandum in Support of its Motion for Judgment on the Pleadings and states:

I.    **Introduction**

The Complaint in this matter filed by Covad Communications Company ("Covad") against Revonet, Inc. ("Revonet") purports to allege causes of action for breach of contract, misappropriation of trade secrets, breach of the covenant of good faith and fair dealing, breach of fiduciary duty, and conversion. All of these alleged wrongdoings arise from disclosure of information by Revonet supposedly prohibited by Mutual Confidentiality and Data Use Agreements entered into between Covad and Revonet in June 2004, June 2005, and January 2006.[1] The Data Use & Confidentiality Agreement bargained for and agreed to by the parties, however, expressly provides on its face and in unambiguous terms that Revonet can use the

---

[1] The Mutual Confidentiality and Data Use Agreements incorporated in the service contracts in June 2004, June 2005, and January 2006 are collectively attached hereto as **Exhibit 1** and are collectively referred to herein as the "Data Use & Confidentiality Agreement." The Data Use & Confidentiality Agreement is attached to the Plaintiff's Complaint as Exhibit A.

information obtained from Covad in the precise manner asserted in Covad's Complaint. Accordingly, Revonet is entitled to judgment as a matter of law on the frivolous Complaint filed by Covad.[2]

## II.    Materials Facts not in Dispute

Revonet is a small Delaware corporation with its principal offices located in Connecticut. (Complaint, ¶ 4).  Prior to the filing of the Complaint, Revonet provided lead generation services to various customers who were marketing telecommunication products, including voice over internet protocols (VoIP) products and services.    (Complaint, ¶¶ 12-15).    Revonet's lead generation services included "inbound" services by which Revonet would respond to customer leads developed through Covad's marketing efforts, as well as "outbound" services where Revonet would provide Covad with customer leads across various markets using Revonet's proprietary Federated Database. (Complaint, at ¶¶ 14-15).  The Federated Database developed by Revonet mapped information derived from its lead generation services and matched the information to its clients' sales criteria, thereby pre-positioning the clients' products and services with the most appropriate leads.  (Complaint, at ¶ 15).

In June 2004, Revonet entered into the first of three Agreement for Services with Covad to provide "inbound" and "outbound" customer lead generation services.  (Complaint, ¶ 12).  As part of the June 2004 Agreement for Services, Revonet required Covad to enter into the Data Use

---

[2] Covad includes in its Complaint several references to purported failures of Revonet under the Agreements for Services.  For instance, at Paragraph 24, Covad asserts that it "was disappointed with the results of the outbound services that Revonet had provided."  These performance complaints are not subject to this lawsuit as all disputes "with the exception of disputes related to breach of confidentiality or intellectual property infringement" are to be determined solely by binding arbitration.  To the extent that Covad is seeking relief beyond purported violations of confidentiality, those claims should be dismissed and compelled to arbitration.

& Confidentiality Agreement. (Complaint, ¶ 16); see also **Exhibit 1**. The June 2004 Agreement

for Services was amended from time to time; however, none of the amendments altered the terms

of the Data Use & Confidentiality Agreement. (Complaint, ¶ 20). Covad and Revonet entered

into the second Agreement for Services in June 2005, which also incorporated the Data Use &

Confidentiality Agreement. (Complaint, ¶ 22). In January 2006, the last Agreement for Services

was executed between the parties and it also incorporated the Data Use & Confidentiality

Agreement. (Complaint, ¶ 26).

As set forth below in detail, the terms of the Data Use & Confidentiality Agreement

provided restrictions on the use of the data, but it also specifically carved out exceptions for

Revonet's use of the data to build its proprietary database and offer such database leads to its

other clients without attribution to Covad. Indeed, the Data Use & Confidentiality Agreement

precisely allows for the uses complained of by Covad in its Complaint. Accordingly, Revonet is

entitled to judgment as a matter of law.

**III.    Standard for Judgment on the Pleadings**

Federal Rule of Civil Procedure 12(c) provides:

(c) **Motion for Judgment on the Pleadings**. After the pleadings are closed but
within such time as not to delay the trial, any party may move for judgment on the
pleadings. If, on a motion for judgment on the pleadings, matters outside the
pleadings are presented to and not excluded by the court, the motion shall be
treated as one for summary judgment and disposed of as provided in Rule 56, and
all parties shall be given reasonable opportunity to present all material made
pertinent to such a motion by Rule 56.

A motion for judgment on the pleadings shall be granted "if the moving party

demonstrates that "no material fact is in dispute and that it is 'entitled to judgment as a matter of

law.'" Peters v. Nat'l R.R. Passenger Corp., 966 F.2d 1483, 1485 (D.C. Cir. 1992) (citation

omitted). All reasonable inferences should be accorded to the benefit of the non-moving party.

Thompson v. District of Columbia, 478 F. Supp. 2d 5, 8 (D.D.C. 2007). In other words, a

motion for judgment on the pleadings under Rule 12(c) should be analyzed similarly to a motion

to dismiss under Rule 12(b)(6). Dale v. Exec. Office of the President, 164 F. Supp. 2d 22, 24

(D.D.C. 2001) (quoting 2 *Moore's Federal Practice* 3d § 12.38, 12-101 ("In fact, any distinction

between them is merely semantic because the same standard applies to motions made under

either subsection.")). Moreover, a court may not consider matters outside the pleadings when

presented with a Rule 12(c) motion, but it may consider "facts alleged in the complaint, <u>any</u>

<u>documents attached to or incorporated in the complaint</u>, matters of which the court may take

judicial notice, and matters of public record." Robinson v. District of Columbia, 403 F. Supp. 2d

39, 47 (D.D.C. 2005) (emphasis added) (citing EEOC v. St. Francis Xavier Parochial School,

117 F.3d 621, 624 (D.C. Cir. 1997)); <u>see also</u> R.G. Fin. Corp. v. Vergara-Nunez, 446 F.3d 178,

182 (1st Cir. 2006); Park Univ. Enters., Inc. v. American Cas. Co., 442 F.3d 1239, 1244 (10th

Cir. 2006). Finally, the moving party need not await discovery before filing a 12(c) motion. <u>See</u>

Carlson v. Reed, 249 F.3d 876, 878 n.1 (9th Cir. 2001) (rejecting as "frivolous" an argument that

a Rule 12(c) motion was granted prematurely where discovery had not yet been completed).

**IV.    Revonet is Entitled To Judgment on the Pleadings as a Matter of Law
Because the Contract at Issue Expressly Allows for the Conduct of Revonet
Asserted in the Complaint.**

As described in the section of Covad's Complaint titled "Nature of the Action," the

Complaint "is an action by Covad against Revonet resulting from Revonet's misappropriation of

Covad's proprietary, confidential and trade secret information." (Complaint, ¶ 1). Further,

Covad explains that the alleged misappropriation resulted from Revonet's "full scale effort to

take for itself Covad's commercially valuable customer lead information and enhance Revonet's

own database of potential customers.  Revonet then sold this information to its other customers, including Covad's direct competitors XO Communications and CallTower, Inc." (Id.).

Covad complains of the same violations in the "Facts" section of the Complaint.  At paragraph 27, Covad mistakenly asserts: "At no time did the parties agree that Covad's proprietary, confidential and trade secret customer lead information . . . could be integrated wholesale into Revonet's Federated Database for sale to third parties, including Covad's competitors." (Complaint, ¶ 27).  Later, in paragraph 29, Covad contends that Revonet took the information generated from its relationship with Covad and "instructed its information technology employees to access and integrate Covad's inbound customer lead information into Revonet's Federated Database on a nightly basis." (Complaint, ¶ 29).  Lastly, Covad complains that Revonet "sought to enhance its Federated Database by using Covad's customer leads Covad provided to Revonet" and that Revonet "shared this information with third parties, including Covad competitors, XO Communications and CallTower, Inc." for "monetary gain." (Complaint, ¶¶ 31-33).  It is the above conduct that comprises the specific set of alleged facts to support Covad's counts for breach of contract, misappropriation of trade secrets, breach of the covenant of good faith and fair dealing, breach of fiduciary duty, and conversion.[3]

Simply put, the Data Use & Confidentiality Agreement by its express, unambiguous, and plain terms allows for the collection and sharing of Covad's lead generation data, the development of a sales lead database by Revonet, the inclusion of Covad's information in the Federated Database, and the providing of such information through the Federated Database by re-

---

[3] In response to an Interrogatory propounded by Revonet asking Covad to describe all facts supporting its assertion of a violation of the Confidentiality Agreement, Covad only referred to documents it provided.  The documents do not demonstrate a disclosure of information to any third party and thus fail to support the claims asserted.

generation to other customers of Revonet.    Specifically, the Data Use & Confidentiality

Agreement, provides:

> WORK PRODUCT.  [Covad] acknowledges that, as between the parties, Revonet is the sole and exclusive owner of all its . . . designs, reports, prospect lists, sales leads . . . database models . . . and other information relating to its lead generation processes that Revonet possesses, acquires from third parties or develops, including without limitation the overall procedure and process that Revonet has developed in running and operating a contract sales center and call and data center environment (collectively "Work Product").

*    *    *

> [Covad] is the sole and exclusive owner of all of its customer lists, target information and business, sales and marketing plans (the "Client Information"). Client information is deemed Confidential Information under Section 2.

*    *    *

> 2. CONFIDENTIALITY.    Each party may disclose confidential or proprietary information abouts its business or products ("Confidential Information") to the other party.   Each party will maintain the other party's Confidential Information in strict confidence and treat the other party's Confidential Information with at least the same degree of care that it treats its own confidential information.  *Subject to this Section 2*, neither party will disclose the other party's Confidential Information to any person, except its directors, officers, employees, contractors and agents (collectively, "Representatives") who need to know such information and are bound by similar confidential obligations.   The obligations concerning Confidential Information shall not apply to information which . . . (4) is independently developed by the receiving party. . . .  *Notwithstanding the above, [Covad] acknowledges that Revonet is in the business of developing and providing proprietary data products (such as market research reports and sales leads) for its clients.    Therefore, [Covad] acknowledges that Client Information provided by [Covad] consisting solely of customer lists, transaction data and related information, may be incorporated and used in such data products as long as it is used only in an aggregate manner, does not contain personally identifiable information, and [Covad] is not identified as the source of such data.   Revonet agrees that the list of sales leads contained in the Work Product provided to [Covad] will not be given to third parties, although the foregoing will not restrict Revonet from re-generating or identifying any such leads from Revonet's databases or third party sources in connection with services requested by such third parties (in which case the sales leads will be deemed part of a different list).*

Exhibit 1 at ¶ 2 (emphasis added).

In Paragraph 1, Revonet retains all interests in its Work Product. Once Client Information, as defined above, is used in the Revonet process to generate the sales leads, reports, and/or proposed lists, of which Revonet is the sole and exclusive owner, then at that point in the process all Covad was entitled to is "a non-exclusive, limited, nontransferable, nonsublicenseable right to use the Work Product." (Exhibit 1, ¶1). Assuming that the inbound data that Covad references in the Complaint was "Client Information" (a fact which is not admitted by Revonet), Paragraph 2 expressly authorized Revonet to incorporate and use Covad's inbound "Client Information," which included Covad's customer lists, transaction data and related information, into Revonet's database.[4] (Exhibit 1, ¶2). Covad further expressly agreed that such information may be re-generated and/or identified in leads from Revonet's databases or third party sources in connection with future services requested by customers of Revonet. (Exhibit 1, ¶2; Complaint, ¶ 17). In other words, the information gathered from Covad by Revonet, contrary to Covad's assertion in the Complaint, could in fact be used in Revonet's database and sold to other customers of Revonet as a re-generated lead. The contract specifically allows for the conduct complained of by Covad and there is no conduct alleged in the Complaint that is outside of the bounds of the Data Use & Confidentiality Agreement.

Moreover, Covad acknowledged in the "Whereas" clauses of the Data Use & Confidentiality Agreement that "Revonet is in the business of providing proprietary data products and solutions . . . " and that "Revonet's technology includes the development of sales leads databases for its customers' benefit." **Exhibit 1**. As a result, Covad knew that Revonet was in

---

[4] Covad did not supply customer lists to Revonet. Inbound data was derived from Revonet from inbound phone calls (1-800 numbers) and web forms resulting from broad marketing activities by Covad and mailing lists, which in some cases were "rented" or licensed from Revonet.

the business of developing a database and providing sales leads for all of its clients and not just

Covad. Armed with this knowledge, Covad entered into the Data Use & Confidentiality

Agreement on three separate occasions. Each time Covad executed the Data Use &

Confidentiality Agreement, Covad agreed that Revonet was the sole and exclusive owner of all

sales leads possessed or developed by Revonet and that all information provided by Covad to

Revonet may be included in a Revonet database and re-generated as a sales lead to other Revonet

customers, including competitors of Covad. Thus, even assuming for purposes of this Motion

only that all of the allegedly wrongful conduct contained in Covad's Complaint is true, the

alleged conduct was quite lawful under the terms of the Data Use & Confidentiality Agreement.

In such circumstances where a complaint alleges conduct that has been agreed to by

parties, it is appropriate to enter judgment as a matter of law. For instance, in Times Mirror

Magazines, Inc. v. Field & Stream Licenses Co., 103 F. Supp. 2d 711 (S.D.N.Y. 2000), aff'd,

294 F.3d 383 (2d Cir. 2002), the plaintiff brought an action against the defendant for a trademark

dispute. The plaintiff alleged breaches of co-existence and settlement agreements entered into by

the parties regarding the use of the trademark "Field & Stream." The defendant moved for

summary judgment, claiming that the agreements unambiguously permitted the conduct of which

plaintiff complained. In response, Times Mirror Magazines, Inc. ("Times Mirror") argued that

summary judgment was inappropriate because genuine issues of fact existed as to the extent and

the meaning of the agreements at issue. The court found in favor of the defendant and granted its

motion for summary judgment. Id. at 721. The Court concluded, "as a matter of law that the

majority of the actions of which Times Mirror complain[ed were] expressly permitted by the

unambiguous language of the agreements." Id. at 721, 735 ("The remaining alleged breaches

were not breaches at all, for the conduct complained of [was] explicitly permitted by the

language of the agreements."); <u>see</u> <u>also</u> <u>Assassination Archives & Research Center v. Central</u> <u>Intelligence Agency</u>, 48 F. Supp. 2d 1 (D.D.C. 1999) ("The [confidentiality] agreement explicitly permits discussion of the substance of the negotiations among counsel, and so long as [the other attorneys] were legitimately serving as . . . [co-]counsel[, Defendant] was entitled to discuss the [settlement] meetings with them.").

Similarly, here, the unambiguous language of the Data Use & Confidentiality Agreement provides for the conduct alleged in the Complaint. Specifically, as set forth above, Covad complains that Revonet used information obtained from Covad, incorporated it into its database, and then provided such information to Revonet's customers. This is precisely what the parties bargained for and was set forth in the plain, unambiguous terms of section 2 of the Data Use & Confidentiality Agreement. There are no allegations in the Complaint that present conduct on the part of Revonet that is beyond the bounds of the Data Use & Confidentiality Agreement. As a result, judgment in favor of Revonet is appropriate.

**V.    Conclusion**

For the reasons set forth above, Revonet is entitled to judgment as a matter of law and an award of attorney's fees incurred in defending this matter under §3426.4 of the California Uniform Trade Secret Act.

Respectfully submitted,


*//S// Jennifer S. Jackman*
Andrew J. Terrell (#431362)
Jennifer J. Jackman (#466922)
Kevin G. Hroblak, Esquire
Whiteford, Taylor & Preston, LLP
1025 Connecticut Ave., NW, #400
Washington, D.C.  20036
(202) 659-6800
(202) 331-0573 (facsimile)

ATTORNEYS FOR DEFENDANT
REVONET, INC.

*207228*

- 10 -

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

COVAD COMMUNICATIONS COMPANY

     Plaintiff,

v.

                                            Civil Court Action No:  1:06cv01892
                                            Next Scheduled Event: Fact Discovery
                                            Closes: 12/5/2007

REVONET, INC.

     Defendant.

## STATEMENT OF MATERIAL FACTS

       COMES NOW Defendant Revonet, Inc. ("Revonet"), by undersigned counsel, and submits this Statement of Material Facts Not In Dispute:

       1.     Revonet is a small Delaware corporation with its principal offices located in Connecticut. (Complaint, ¶ 4).

       2.     Prior to the filing of the Complaint, Revonet provided lead generation services to various customers who were marketing telecommunication products, including voice over internet protocols (VoIP) products and services. (Complaint, ¶¶ 12-15).

       3.     Revonet's lead generation services included "inbound" services by which Revonet would respond to customer leads developed through Covad's marketing efforts, as well as "outbound" services where Revonet would provide Covad with customer leads across various markets using Revonet's proprietary Federated Database.  (Complaint, at ¶¶ 14-15).

       4.     The Federated Database developed by Revonet mapped information derived from its lead generation services and matched the information to its clients' sales criteria, thereby pre-positioning the clients' products and services with the most appropriate leads.  (Complaint, at ¶ 15).

5.      In June 2004, Revonet entered into the first of three Agreement for Services with Covad to provide "inbound" and "outbound" customer lead generation services.  (Complaint, ¶ 12).

6.      As part of the June 2004 Agreement for Services, Revonet required Covad to enter into the Data Use & Confidentiality Agreement.   (Complaint, ¶ 16; Exhibit 1 to Complaint).

7.      The June 2004 Agreement for Services was amended from time to time; however, none of the amendments altered the terms of the Data Use & Confidentiality Agreement. (Complaint, ¶ 20).

8.      Covad and Revonet entered into the second Agreement for Services in June 2005, which also incorporated the Data Use & Confidentiality Agreement.  (Complaint, ¶ 22).

9.      In January 2006, the last Agreement for Services was executed between the parties and it also incorporated the Data Use & Confidentiality Agreement.  (Complaint, ¶ 26).

Respectfully submitted,


/s/ Jennifer S. Jackman
Andrew J. Terrell (#431362)
Jennifer S. Jackman (#466922)
Kevin G. Hroblak, Esquire
Whiteford, Taylor & Preston L.L.P.
1025 Connecticut Avenue, NW
Washington, DC  20036-5405
(202) 659-6800

Attorneys for Defendant,
REVONET, INC.

207830

- 2 -

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

COVAD COMMUNICATIONS COMPANY

      Plaintiff,

v.

        Civil Court Action No:  1:06cv01892
        Next Scheduled Event: Fact Discovery
        Closes: 12/5/2007

REVONET, INC.

      Defendant.

## **TABLE OF AUTHORITIES**

| | | |
|---|---|---|
| 1. | Peters v. Nat'l R.R. Passenger Corp., 966 F.2d 1483 (D.C. Cir. 1992). | Memorandum, page 3. |
| 2. | Thompson v. District of Columbia, 478 F. Supp. 2d 5 (D.D.C. 2007). | Memorandum, page 3. |
| 3. | Dale v. Exec. Office of the President, 164 F. Supp. 2d 22 (D.D.C. 2001). | Memorandum, page 3. |
| 4. | Robinson v. District of Columbia, 403 F. Supp. 2d 39 (D.D.C. 2005). | Memorandum, page 4. |
| 5. | EEOC v. St. Francis Xavier Parochial School, 117 F.3d 621 (D.C. Cir. 1997). | Memorandum, page 4. |
| 6. | R.G. Fin Corp. v. Vergara-Nunez, 446 F.3d 178 (1st Cir. 2006). | Memorandum, page 4. |
| 7. | Park Univ. Enters., Inc. v. American Cas. Co., 442 F.3d 1239 (10th Cir. 2006). | Memorandum, page 4. |
| 8. | Carlson v. Reed, 249 F.3d 876 (9th Cir. 2001). | Memorandum, page 4. |
| 9. | Times Mirror Magazines, Inc. v. Field & Stream Licenses, Co., 103 F.Supp. 2d 711 (S.D.N.Y. 2000), aff'd, 294 F.3d 383 (2d Cir. 2002). | Memorandum, page 8. |
| 10. | Assassination Archives & Research Center v. Central Intelligence Agency, 48 F.Supp. 2d 1 (D.D.C. 1999). | Memorandum, page 8. |
| 11. | F.R.C.P. Rule 12(c). | Motion, page 1; Memorandum, page 3. |

## Attachment A-4
### REVONET – MUTUAL CONFIDENTIALITY AND DATA USE AGREEMENT

This Mutual Confidentiality and Data Use Agreement ("Agreement") made by Revonet, Inc., a Delaware corporation ("Revonet") and Covad Communications Company, a California corporation ("Client").

WHEREAS, Revonet is in the business of providing proprietary data products and solutions supported by patent pending technology;

WHEREAS, Revonet's technology includes the development of sales leads databases for its customers' benefit; and

WHEREAS, Client has received from Revonet certain ancillary agreements (including the Agreement for Services between the parties, or the "Services Agreement") pursuant to which Client and Revonet plan to share data, which reference this document and are governed by the terms of this Agreement.

NOW THEREFORE, the parties hereto hereby agree as follows:

1. **WORK PRODUCT & CLIENT INFORMATION.** (a) WORK PRODUCT.   Client acknowledges that, as between the parties, Revonet is the sole and exclusive owner of all its inventions, know-how, designs, reports, prospect lists, sales leads, business strategies, software, database models, statistical methods and other information relating to its lead generation processes that Revonet possesses, acquires from third parties or develops, including without limitation the overall procedure and process that Revonet has developed in running and operating a contract sales center and call and data center environment (collectively, "Work Product"). Subject to the terms of this Agreement, Revonet grants to Client a non-exclusive, limited, nontransferable (subject to Section 6), nonsublicenseable right to use the Work Product that Revonet provides to Client for during the applicable term of the Services Agreement (the "License").   The License is limited for use for Client's internal business purposes and marketing efforts, and Client may use the sales reports and prospect lists delivered hereunder in any manner that Client sees fit for its business.   Client shall not publish or disclose the Work Product to anyone other than Client's officers, directors, contractors and employees. Client acknowledges that some Revonet third party data providers have standard terms and restrictions governing end users' access to their data, and Client agrees to abide by those restrictions once provided to client in writing (as may be amended from time to time) and agreed to in writing by Client (provided that Client acknowledges that, in the absence of its agreement, it may not be entitled to use any of such third party data, and may necessitate Revonet's termination of this Agreement) including without limitation the Dun & Bradstreet standard terms (to which Client hereby agrees). Client acknowledges that the Work Product includes works of authorship (such as original compilations and selections of data) and trade secrets that have been developed at considerable time and expense, and that unauthorized use or disclosure would unfairly and irreparably harm Revonet. (b) CLIENT INFORMATION. Client is the sole and exclusive owner of all of its information delivered by Client to Revonet, including without limitation its customer lists, target information and business, sales and marketing plans (the "Client Information"). Client Information is deemed "Confidential Information" under Section 2.  Client grants to Revonet a nonexclusive, limited, nontransferable (subject to Section 6), nonsublicenseable right to use the Client Information that Client provides to Revonet during the applicable term of the Services Agreement solely for  (i) Revonet's business purposes as permitted in Section 2; and (ii) for the purpose of performing services to Client.  Revonet further acknowledges that the Metric View Report generated for Client shall be deemed Client Information, and Revonet assigns all of its right, title and interest thereto to Client.  The license described in the preceding sentence shall not apply to the Metric View Report.

2. **CONFIDENTIALITY.** Each party may disclose confidential or proprietary information about its business or products ("Confidential Information") to the other party. Each party will maintain the other party's Confidential Information in strict confidence and treat the other party's Confidential Information with at least the same degree of care that it treats its own confidential information. Subject to this Section 2, neither party will disclose the other party's Confidential Information to any person, except its directors, officers, employees, contractors and agents (collectively, "Representatives") who need to know such information and are bound by similar confidentiality obligations. The obligations concerning Confidential Information shall not apply to information which (1) is generally available to the public through no act or omission of the receiving party; (2) was already in the party's possession prior to the date of disclosures without restriction to the other party as to use or disclosure; (3) was available to the party from a source other than the other party who has the right to disclose it and provides it without restriction to the other party as to its use or disclosure; or (4) is independently developed by the receiving party. The provisions of this Section will not restrict a party from disclosing the other party's Confidential Information to the extent required by any law or regulation; provided that the party required to make such a disclosure uses reasonable efforts to give the other party reasonable advance notice of such required disclosure in order to enable the other party to prevent or limit such disclosure. Notwithstanding the above, Client acknowledges that Revonet is in the business of developing and providing proprietary data products (such as market research reports and sales leads) for its clients. Therefore, Client acknowledges that Client Information provided by Client consisting solely of customer lists, transaction data and related information, may be incorporated and used in such data products as long as it is used only in an aggregate manner, does not contain personally identifiable information and Client is not identified as the source of such data.  Revonet agrees that the list of sales leads contained in the Work Product provided to Client will not be given by Revonet to third parties, although the foregoing will not restrict Revonet from re-generating or identifying any such leads from Revonet's databases or third party sources in connection with services requested by such third parties (in which case the sales leads will be deemed part of a different list).

3. **DISCLAIMER.** EXCEPT AS EXPRESSLY PROVIDED IN SECTION 4 OF THE SERVICES AGREEMENT, REVONET HEREBY DISCLAIMS ANY AND ALL WARRANTIES (INCLUDING WITHOUT LIMITATION ITS SALES LEADS DATABASE AND WORK PRODUCT), EXPRESS AND IMPLIED, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTIES OF MERCHANTABILITY, NONINFRINGEMENT AND FITNESS FOR A PARTICULAR PURPOSE. REVONET DOES NOT MAKE, AND HEREBY DISCLAIMS ANY WARRANTY AS TO THE ACCURACY, COMPLETENESS, CURRENCY, OR RELIABILITY OF ANY INFORMATION OR OTHER DATA WHICH MAY BE PROVIDED.

4. **LIMITATIONS AND EXCLUSIONS OF LIABILITY.** EXCEPT WITH RESPECT TO AMOUNTS PAYABLE TO THIRD PARTIES PURSUANT TO THE INDEMNIFICATION OBLIGATIONS IN THE SERVICES AGREEMENT, IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, INCLUDING BUT NOT LIMITED TO LOST SALES, LOST REVENUES OR LOST PROFITS, INCURRED BY THE OTHER PARTY AND ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, WHETHER BASED UPON BREACH OF CONTRACT OR TORT, INCLUDING NEGLIGENCE, AND EVEN IF A PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. IN NO EVENT SHALL EITHER PARTY'S LIABILITY ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT EXCEED THE TOTAL AMOUNTS PAID TO REVONET IN RELATION HERETO.

5. **TERM/TERMINATION.** This Agreement shall commence on the day signed below ("Effective Date") and end upon the termination of the Services Subscription Agreement (or, if none is in effect or specified therein, then upon one year from the Effective Date).  This Agreement may be terminated earlier for the other party's material breach of this Agreement or any outstanding Database Subscription Agreement. Upon termination of this Agreement, the licenses granted by both parties in Section 1(a) and (b) shall survive for any Work Product or Client Information previously exchanged between the parties.  All other rights and obligations of the parties under this Agreement shall survive termination (including confidentiality obligations in Section 2).

6. **MISCELLANEOUS.** Each party acknowledges that the unauthorized use or disclosure of the disclosing party's Confidential Information may cause the disclosing party to incur irreparable harm and significant

EXHIBIT

1

damages, the degree of which may be difficult to ascertain. Accordingly, each party agrees that the disclosing party will have the right to seek immediate equitable relief to enjoin any unauthorized use or disclosure of its Confidential Information, in addition to any other rights and remedies that it may have at law or otherwise. Client represents and warrants that it has no conflicting obligations with third parties that will prohibit it from undertaking the services with Revonet or from providing the information and data to Revonet for use as contemplated under this Agreement. The rights and obligations of Client and Revonet may not be assigned without the prior written consent of the other party, except in the case of a merger or sale of all or substantially all of the relevant business of either party. The parties agree that they shall obtain the other party's approval prior to issuing any announcement or press release concerning this Agreement or the business relationship between the parties. This Agreement, and the agreement referenced hereunder, constitute the entire understanding

of the parties. To the extent there are any inconsistencies between the provisions of this Agreement and any other agreements referenced herein, or any other Agreements executed between the parties, this Agreement shall govern (regardless of any conflicting language or preemptive that may be contained in such other agreements). Neither this Agreement nor its terms may be amended except pursuant to a written amendment or change order signed by both parties. This Agreement shall be interpreted and enforced in accordance with the laws of the State of California without regard to conflicts of laws principles thereof, and the parties agrees to the exclusive jurisdiction and venue of courts in the State of California if an action is initiated by Revonet and Washington D.C., if initiated by Client. If any provision of this Agreement is held by a court or tribunal of competent jurisdiction to be unenforceable, that provision will be enforced to the maximum extent permissible, and the other provisions of this Agreement will remain in full force and effect.

Accepted and agreed to:

Revonet, Inc.

By: _____

Name: SCOTT HOWARD

Title: CHAIRMAN

Date: 6/28/04

Client:

By: _____

Name: CHARLES HOFFMAN

Title: CEO

Date: 6/29/04

## Attachment A-4
### REVONET – MUTUAL CONFIDENTIALITY AND DATA USE AGREEMENT

This Mutual Confidentiality and Data Use Agreement ("Agreement") made by Revonet, Inc., a Delaware corporation ("Revonet") and Covad Communications Company, a California corporation ("Client").

**WHEREAS**, Revonet is in the business of providing proprietary data products and solutions supported by patent pending technology;

**WHEREAS**, Revonet's technology includes the development of sales leads databases for its customers' benefit; and

**WHEREAS**, Client has received from Revonet certain ancillary agreements (including the Agreement for Services between the parties, or the "Services Agreement") pursuant to which Client and Revonet plan to share data, which reference this document and are governed by the terms of this Agreement.

**NOW THEREFORE**, the parties hereto hereby agree as follows:

1. **WORK PRODUCT & CLIENT INFORMATION.** (a) WORK PRODUCT. Client acknowledges that, as between the parties, Revonet is the sole and exclusive owner of all its inventions, know-how, designs, reports, prospect lists, sales leads, business strategies, software, database models, statistical methods and other information relating to its lead generation processes that Revonet possesses, acquires from third parties or develops, including without limitation the overall procedure and process that Revonet has developed in running and operating a contract sales center and call and data center environment (collectively, "Work Product"). Subject to the terms of this Agreement, Revonet grants to Client a non-exclusive, limited, nontransferable (subject to Section 6), nonsublicenseable right to use the Work Product that Revonet provides to Client for during the applicable term of the Services Agreement (the "License"). The License is limited for use for Client's internal business purposes and marketing efforts, and Client may use the sales reports and prospect lists delivered hereunder in any manner that Client sees fit for its business. Client shall not publish or disclose the Work Product to anyone other than Client's officers, directors, contractors and employees. Client acknowledges that some Revonet third party data providers have standard terms and restrictions governing end users' access to their data, and Client agrees to abide by those restrictions once provided to client in writing (as may be amended from time to time) and agreed to in writing by Client (provided that Client acknowledges that, in the absence of its agreement, it may not be entitled to use any of such third party data, and may necessitate Revonet's termination of this Agreement) including without limitation the Dun & Bradstreet standard terms (to which Client hereby agrees). Client acknowledges that the Work Product includes works of authorship (such as original compilations and selections of data) and trade secrets that have been developed at considerable time and expense, and that unauthorized use or disclosure would unfairly and irreparably harm Revonet. (b) CLIENT INFORMATION. Client is the sole and exclusive owner of all of its information delivered by Client to Revonet, including without limitation its customer lists, target information and business, sales and marketing plans (the "Client Information"). Client Information is deemed "Confidential Information" under Section 2. Client grants to Revonet a nonexclusive, limited, nontransferable (subject to Section 6), nonsublicenseable right to use the Client Information that Client provides to Revonet during the applicable term of the Services Agreement solely for (i) Revonet's business purposes as permitted in Section 2; and (ii) for the purpose of performing services to Client. Revonet further acknowledges that the Metric View Report generated for Client shall be deemed Client Information, and Revonet assigns all of its right, title and interest thereto to Client. The license described in the preceding sentence shall not apply to the Metric View Report.

2. **CONFIDENTIALITY.** Each party may disclose confidential or proprietary information about its business or products ("Confidential Information") to the other party. Each party will maintain the other party's Confidential Information in strict confidence and treat the other party's Confidential Information with at least the same degree of care that it treats its own confidential information. Subject to this Section 2, neither party will disclose the other party's Confidential Information to any person, except its directors, officers, employees, contractors and agents (collectively, "Representatives") who need to know such information and are bound by similar confidentiality obligations. The obligations concerning Confidential Information shall not apply to information which (1) is generally available to the public through no act or omission of the receiving party; (2) was already in the party's possession prior to the date of disclosures without restriction to the other party as to use or disclosure; (3) was available to the party from a source other than the other party who has the right to disclose it and provides it without restriction to the other party as to its use or disclosure; or (4) is independently developed by the receiving party. The provisions of this Section will not restrict a party from disclosing the other party's Confidential Information to the extent required by any law or regulation; provided that the party required to make such a disclosure uses reasonable efforts to give the other party reasonable advance notice of such required disclosure in order to enable the other party to prevent or limit such disclosure. Notwithstanding the above, Client acknowledges that Revonet is in the business of developing and providing proprietary data products (such as market research reports and sales leads) for its clients. Therefore, Client acknowledges that Client Information provided by Client consisting solely of customer lists, transaction data and related information, may be incorporated and used in such data products as long as it is used only in an aggregate manner, does not contain personally identifiable information and Client is not identified as the source of such data. Revonet agrees that the list of sales leads contained in the Work Product provided to Client will not be given by Revonet to third parties, although the foregoing will not restrict Revonet from re-generating or identifying any such leads from Revonet's databases or third party sources in connection with services requested by such third parties (in which case the sales leads will be deemed part of a different list).

3. **DISCLAIMER.** EXCEPT AS EXPRESSLY PROVIDED IN SECTION 4 OF THE SERVICES AGREEMENT, REVONET HEREBY DISCLAIMS ANY AND ALL WARRANTIES (INCLUDING WITHOUT LIMITATION ITS SALES LEADS DATABASE AND WORK PRODUCT), EXPRESS AND IMPLIED, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTIES OF MERCHANTABILITY, NONINFRINGEMENT AND FITNESS FOR A PARTICULAR PURPOSE. REVONET DOES NOT MAKE, AND HEREBY DISCLAIMS ANY WARRANTY AS TO THE ACCURACY, COMPLETENESS, CURRENCY, OR RELIABILITY OF ANY INFORMATION OR OTHER DATA WHICH MAY BE PROVIDED.

4. **LIMITATIONS AND EXCLUSIONS OF LIABILITY.** EXCEPT WITH RESPECT TO AMOUNTS PAYABLE TO THIRD PARTIES PURSUANT TO THE INDEMNIFICATION OBLIGATIONS IN THE SERVICES AGREEMENT, IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, INCLUDING BUT NOT LIMITED TO LOST SALES, LOST REVENUES OR LOST PROFITS, INCURRED BY THE OTHER PARTY AND ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, WHETHER BASED UPON BREACH OF CONTRACT OR TORT, INCLUDING NEGLIGENCE, AND EVEN IF A PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. IN NO EVENT SHALL EITHER PARTY'S LIABILITY ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT EXCEED THE TOTAL AMOUNTS PAID TO REVONET IN RELATION HERETO.

5. **TERM/TERMINATION.** This Agreement shall commence on the day signed below ("Effective Date") and end upon the termination of the Services Subscription Agreement (or, if none is in effect or specified therein, then upon one year from the Effective Date). This Agreement may be terminated earlier for the other party's material breach of this Agreement or any outstanding Database Subscription Agreement. Upon termination of this Agreement, the licenses granted by both parties in Section 1(a) and (b) shall survive for any Work Product or Client Information previously exchanged between the parties. All other rights and obligations of the parties under this Agreement shall survive termination (including confidentiality obligations in Section 2).

6. **MISCELLANEOUS.** Each party acknowledges that the unauthorized use or disclosure of the disclosing party's Confidential Information may cause the disclosing party to incur irreparable harm and significant

**REV0304**



damages, the degree of which may be difficult to ascertain. Accordingly, each party agrees that the disclosing party will have the right to seek immediate equitable relief to enjoin any unauthorized use or disclosure of its Confidential Information, in addition to any other rights and remedies that it may have at law or otherwise.    Client represents and warrants that it has no conflicting obligations with third parties that will prohibit it from undertaking the services with Revonet or from providing the information and data to Revonet for use as contemplated under this Agreement. The rights and obligations of Client and Revonet may not be assigned without the prior written consent of the other party, except in the case of a merger or sale of all or substantially all of the relevant business of either party. The parties agree that they shall obtain the other party's approval prior to issuing any announcement or press release concerning this Agreement or the business relationship between the parties. This Agreement, and the agreement referenced hereunder, constitute the entire understanding

of the parties.  To the extent there are any inconsistencies between the provisions of this Agreement and any other agreements referenced herein, or any other Agreements executed between the parties, this Agreement shall govern (regardless of any conflicting language or preemptive that may be contained in such other agreements).  Neither this Agreement nor its terms may be amended except pursuant to a written amendment or change order signed by both parties.    This Agreement shall be interpreted and enforced in accordance with the laws of the State of California without regard to conflicts of laws principles thereof, and the parties agrees to the exclusive jurisdiction and venue of courts in the State of California if an action is initiated by Revonet and Washington D.C., if initiated by Client.  If any provision of this Agreement is held by a court or tribunal of competent jurisdiction to be unenforceable, that provision will be enforced to the maximum extent permissible, and the other provisions of this Agreement will remain in full force and effect.

**Accepted and agreed to:**

Revonet, Inc.

By: _____

Name: Scott Howard

Title: CEO

Date: 1/12/06

Client:

By: _____

Name: Michael Hanley

Title: COO

Date: 1/16/06

**REV0305**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

COVAD COMMUNICATIONS COMPANY

     Plaintiff,

v.

REVONET, INC.

     Defendant.

Civil Court Action No:  1:06cv01892
Next Scheduled Event: Fact Discovery
Closes: 12/5/2007

---

## <u>ORDER</u>

THIS MATTER having come before the Court on Defendant Revonet's Motion for

Judgment on the Pleadings, it is hereby

ORDERED, that the Defendant's Motion is hereby GRANTED; and it is further

ORDERED that judgment is entered in Defendant's favor; and it is further

ORDERED that Plaintiff must pay Defendant's attorney's fees incurred in defending this

matter in the amount of _____.

IT IS SO ORDERED.

_____
Judge Colleen Kollar-Kotelly

COPIES TO:

Jennifer S. Jackman, Esq.
WHITEFORD, TAYLOR & PRESTON, LLP
1025 Connecticut Avenue, NW, Suite 400
Washington, DC 20036

John A. Burlingame
Squire, Sanders & Dempsey, LLP
1201 Pennsylvania Avenue, NW
Suite 500
Washington, D.C.  20004

*207832*