IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

COVAD COMMUNICATIONS COMPANY

     Plaintiff,

v.

                            Civil Court Action No:  1:06cv01892
                            Next Scheduled Event: Fact Discovery
                            Closes: 12/5/2007

REVONET, INC.

     Defendant.

## REVONET'S REPLY TO OPPOSITION TO MOTION FOR JUDGMENT

COMES NOW Defendant Revonet, Inc. ("Revonet"), by undersigned counsel, and submits this Reply to Opposition to Motion for Judgment on the Pleadings and states:

## INTRODUCTION

Covad's Opposition is remarkable for what it states, but more so for what it omits. Recognizing the inability to confront head-on the arguments in Revonet's Motion for Judgment (the "Motion"), Covad transparently attempts to confuse the Court and blindly assert that the Confidentiality and Data Use Agreement (the "Data Use Agreement") on which its Complaint is based is ambiguous, without any further explanation.

The only accurate representation contained in Covad's Opposition is its recitation of the standard of proof for a Motion for Judgment, a standard that Revonet has met without a doubt. A review of the briefs submitted by the parties, coupled with Covad's woefully deficient discovery responses, yields but one conclusion:  Covad, a telecommunications giant, filed a frivolous lawsuit against Revonet without any factual basis for doing so, to place severe economic pressure on Revonet, a small-sized competitor, in order to execute on a express threat and oust Revonet

from the telecommunications field so that Covad could gain a competitive advantage.  Covad's

conduct is so egregious that the Court should award Revonet all costs and attorneys fees it

incurred in defense of this case under Section 3426.4 of the California Uniform Trade Secret

Act.[1]

As more fully set forth in Revonet's Motion, the Data Use Agreement bargained for and

agreed to by the parties on multiple occasions for several years expressly provides on its face and

in unambiguous terms that Revonet can use the information obtained from Covad in the precise

manner asserted in Covad's Complaint.  Covad has utterly failed in its Opposition to explain why

Revonet's interpretation of the Data Use Agreement is flawed.  Accordingly, Revonet is entitled

to judgment as a matter of law.

**COVAD FAILED TO DEMONSTRATE HOW THE DATA USE AGREEMENT
PROHIBITS THE CONDUCT ALLEGED IN ITS COMPLAINT**

A.      Covad Ignores the Key Language of the Data Use Agreement

Quite tellingly, Covad's Opposition completely ignores the unambiguous language

contained in the Data Use Agreement and cited by Revonet that authorizes the very conduct

alleged in the Complaint -- the crux of Revonet's Motion for Judgment.  Rather than address or

attempt to explain the language in the Data Use Agreement, or rebut Revonet's argument in its

Motion, Covad hides from the relevant language by omitting any mention of such language in its

Opposition argument.

In its Motion, Revonet set forth the clear, applicable terms of the Data Use Agreement

and explained why the allegations in the Complaint were specifically contemplated by the parties

and provided for in their Data Use Agreement.  In its Opposition, however, Covad makes the

---

[1] The California Uniform Trade Secret Act is applicable to this proceeding because the Agreement for Services under which Revonet performed applies California law.  Further, Covad acknowledges its applicability in the

conclusory statement that the Data Use Agreement "imposes important constraints on Revonet's re-generation or identification of sales leads." Opposition at 4. To support such bald statement, Covad cites in its "Argument" section only a fraction of the Data Use Agreement which protects disclosure of "Work Product" prepared for Covad to third parties. *Id.* (citing Data Use Agreement at ¶ 2). This citation is misplaced for at least three reasons.

First, nowhere in the Complaint does Covad allege that Work Product of Revonet prepared for Covad was given to any third party. Instead, Covad asserts that the Complaint "is an action by Covad against Revonet resulting from Revonet's misappropriation of Covad's proprietary, confidential and trade secret information," not Revonet's Work Product. (Complaint, ¶ 1). Further, Covad explains that the alleged misappropriation resulted from Revonet's "full scale effort to take for itself Covad's commercially valuable customer lead information and enhance Revonet's own database of potential customers. Revonet then sold this information to its other customers, including Covad's direct competitors XO Communications and CallTower, Inc." (Id.). Again, Covad does not contend that Revonet's Work Product prepared for Covad was provided to a third party.[2] Accordingly, the only part of the Data Use Agreement cited by Covad in the Argument section of its Opposition is irrelevant to the allegations by Covad in its Complaint.

Second, the language of the Data Use Agreement cited by Revonet in its Motion to support its use of the data was remarkably omitted from Covad's Opposition. Surprisingly, it is not even addressed in the text of the Opposition. The pertinent part of the Data Use Agreement in its entirety is as follows:

---

Complaint by citing to the same statute.

[2] Other relevant allegations of Covad are contained in paragraphs 27, 29, 31-33. None of these allegations support the provision of Revonet's Work Product prepared for Covad to a third party.

> *Subject to this Section 2, neither party will disclose the other party's Confidential Information to any person, except its directors, officers, employees, contractors and agents (collectively, "Representatives") who need to know such information and are bound by similar confidential obligations. The obligations concerning Confidential Information shall not apply to information which . . . (4) is independently developed by the receiving party. . . .* **Notwithstanding the above, [Covad] acknowledges that Revonet is in the business of developing and providing proprietary data products (such as market research reports and sales leads) for its clients. Therefore, [Covad] acknowledges that Client Information provided by [Covad] consisting solely of customer lists, transaction data and related information, may be incorporated and used in such data products as long as it is used only in an aggregate manner, does not contain personally identifiable information, and [Covad] is not identified as the source of such data. Revonet agrees that** the list of sales leads contained in the Work Product provided to [Covad] will not be given to third parties, although the foregoing will not restrict Revonet from re-generating or identifying any such leads from Revonet's databases or third party sources in connection with services requested by such third parties (in which case the sales leads will be deemed part of a different list).

Data Use Agreement at ¶ 2 (Emphasis in italics added to illustrate the part omitted by Covad).

As the Court can see, Covad has disingenuously omitted a directly applicable portion of the text upon which Revonet relies. That text, in plain, clear terms, allows Revonet to use the information gathered from Covad by Revonet in its database. Further, it allows, subject to the information being used in an aggregate manner, without any personally identifiable information, and Covad not being identified as the source, provision of re-generated lead information to third parties. The contract, therefore, specifically allows for the conduct complained of by Covad and there is no conduct alleged in the Complaint that is outside of the bounds of the Data Use & Confidentiality Agreement. In its Opposition, Covad fails to demonstrate, or even address, why such interpretation is flawed.

Third, even the selected excerpt cited by Covad demonstrates the parties' intent that information provided by Covad would be made available to third parties. Indeed, the cited paragraph at page 4 of the Opposition includes the following qualification, "although the

foregoing will not restrict Revonet from re-generating or identifying any such leads from Revonet's databases or third party sources in connection with services requested by third parties . . . ."  While Covad selected only a small portion of the Data Use Agreement to argue to this Court, even the portion it selected supports Revonet's position.  Covad has failed to address, let alone explain, why Paragraph 2 of the Data Use Agreement read as a whole prohibits the conduct alleged in the Complaint.

        B.      Covad Attempts to Create Ambiguity by Selectively Citing to
                  Excerpts of the Data Use Agreement

Next, having failed to concoct an argument against the plain meaning of the relevant terms of the Data Use Agreement, Covad attempts to escape from a judgment against it by selectively citing to the Data Use Agreement thereby misrepresenting its terms as a whole to this Court.  For example, Covad misrepresents that:

> [T]he Confidentiality Agreement prohibits disclosure of Covad's "Confidential Information", which includes Covad's Customer Lead Information, to any person except Revonet's representatives "who need[ed] to know such information."

Opposition at 4.[3]

The above statement is a red herring to the issues presented in the Complaint because nowhere in the Complaint does Covad allege that Revonet did anything other than incorporate Covad's data into its database and provide leads to its customers using information from the database, which included Covad's Client Information.  Further, Covad ignores the "Client Information" defined term in the Data Use Agreement and attempts to muddy the waters by intermixing the contractual terms "Confidential Information" and "Client Information" with its

---

[3] The term "Customer Lead Information" is not a contractual term; rather, Covad has defined it generically to include Covad's "proprietary, confidential and trade secret customer lead information."  Opposition at 1.

newly-created term "Customer Lead Information."[4]  Nevertheless, as explained extensively in the

Motion for Judgment, the very terms of the Data Use Agreement provide for such incorporation

of Client Information into the Revonet database and re-generation of leads to third parties.[5]  *See*

Data Use Agreement at ¶ 2 (". . . [Covad] acknowledges that Client Information provided by

[Covad] . . . may be incorporated and used in such data products . . . .").

  While Revonet acknowledges that the Data Use Agreement prevents it from providing

Covad's Confidential Information directly to a third party, which is the subject matter of the

limited clause cited by Covad, its does not prevent the only conduct complained of in the

Complaint, *i.e.* incorporating Client Information into Revonet's database for re-generation to

third parties.   Accordingly, Covad's conclusory statement that Revonet was prohibited from

disclosing Covad's "Confidential Information" is misplaced and not relevant to this litigation.

  Covad also argues that Revonet's reading of the Data Use Agreement would render the

provision prohibiting disclosure by Revonet of Confidential Information to anyone other than its

representatives meaningless.  This conclusion by Covad is based on its misunderstanding of the

Data Use Agreement.  When read as a whole, it becomes clear that the Data Use Agreement

provides certain protections and also provides for certain uses.  Specifically, when raw data is

received by Revonet from Covad, such data is specific to Covad's business.  The information,

which is tied to Covad as the source, would be valuable to a competitor in that form as it may

reveal how Covad is targeting business and creating its sales leads.  It is this Confidential

---

[4] Indeed, in footnote 3 of the Opposition, Covad defines "Confidential Information" to include "customer lists, target information, and business, sales, and marketing plans."  These categories, however, are defined in the Data Use Agreement as "Client Information."  The distinction is important as it is the Client Information that is allowed to be incorporated into the database and re-generated to third parties.

Information that cannot be disclosed to third parties in that form.  *See* Opposition at 4 (citing Data Use Agreement at ¶ 2).  Instead, as with its other clients, Revonet is allowed to take such Client Information, incorporate it into its database in aggregate fashion and build a database containing aggregated data from its combined customers.  In fact, the parties recite this business approach in the Data Use Agreement.  *See* Data Use Agreement at ¶ 2 ("[Covad] acknowledges that Revonet is in the business of developing and providing proprietary data products (such as market research and sales leads) for its clients.").  This data is then output based on specific customer criteria to re-generate leads for its customers.  It is this re-generated sales lead that can be provided to Revonet's customers, including Covad without attribution to the original client for whom the data was generated.  *See* Data Use Agreement at ¶ 2 (". . . the foregoing will not restrict Revonet from re-generating or identifying and such leads from Revonet's databases or third party sources in connection with services requested by such third parties (in which case the sales leads will be deemed part of a different list.)).  Knowing (and acknowledging this practice in the Data Use Agreement) that the database contains aggregated industry information, Revonet's customers, including Covad, seek sales leads from the combined database.  This arrangement is specifically and unambiguously provided for within the four corners of the Data Use Agreement when read as a whole.  Covad's attempt to render parts of the agreement meaningless by selective and strained citations is inappropriate.

---

[5] Covad acknowledged and agreed that Revonet was in the business of developing sales leads for all of its clients -- not just Covad.  Covad further agreed that Covad's "Confidential Information" could be incorporated into Revonet's database which would be used to generate such leads for other clients.  Indeed, Covad understood and valued Revonet's business model when it derived value and benefitted from that very database by obtaining sales leads generated from that database that included information Revonet developed through its work for other clients.

C.      Covad Failed To Articulate Any Ambiguity Within the Data Use Agreement.

Covad's argument that the Data Use Agreement is ambiguous is simply a desperate attempt to stave off dismissal of its claims as is evidenced by Covad's failure to articulate *how* the agreement is ambiguous.  Left with only a hope that it can somehow demonstrate that the Data Use Agreement is unclear, Covad does not muster the necessary showing.  Indeed, Covad goes to great effort to cite black letter law regarding the standards for determining whether a contract is ambiguous but fails to articulate any differing reasonable interpretations of the agreement so as to prove any ambiguity.  Like its strained interpretations above, Covad has attempted to manufacture ambiguity by omitting the unambiguous, clear, and material terms relied upon by Revonet that allow for but one interpretation of the Data Use Agreement as a whole.  *See National Railroad Passenger Corp. v. Lexington Ins. Co.*, 2003 U.S. Dist. LEXIS 26405 (May 20, 2003) (quoting *Lupo v. Shelter Mut. Ins. Co.*, 70 S.W.3d 16, 19 (Mo. App. 2002)) ("'To determine whether a contract is ambiguous' the whole contract must be considered . . . .").

The only cite to the Data Use Agreement by Covad to show its alleged ambiguity is to Paragraph 2 wherein, according to Covad, the agreement "prohibits Revonet from disclosing Covad's Confidential Information to any person except its representatives."  Opposition at 6.  Covad, however, again fails to address other applicable terms of the Data Use Agreement.  For instance, following the limitation on disclosure to persons other than representatives, the agreement provides the carve-out applicable to this matter:  "*Notwithstanding the above*, [Covad] acknowledges that Revonet is in the business of developing and providing proprietary data products (such as market research reports and sales leads) for its clients.  Therefore, [Covad] acknowledges that Client Information provided by [Covad] consisting solely of customer lists,

transaction data and related information, *may be incorporated and used in such data products* as long as it is used only in an aggregate manner, does not contain personally identifiable information, and [Covad] is not identified as the source of such data." (Emphasis added).

Thus, the provisions are entirely consistent when read as a whole. Pursuant to the terms cited by Covad, Revonet was not allowed to obtain Covad's Client Information and then simply share that information directly with third parties. It had to keep such information confidential so as to prevent disclosure to anyone other than its representatives. It should be noted that this type of conduct is not alleged to have occurred; rather, Covad complains that the information was then uploaded into Revonet's database and new leads were then provided to customers of Revonet, including Covad's competitors. The remaining terms of Paragraph 2 of the Data Use Agreement allow just that. Indeed, Revonet was expressly allowed to "incorporate" the Client Information into its database and re-generate sales leads for third parties without identifying who the specific source of the information was. Covad cannot now complain of the very terms to which it previously agreed. "Freedom of contract prevails in an arm's length transaction between sophisticated parties such as these, and in the absence of countervailing public policy concerns there is no reason to relieve them of the consequences of their bargain. If they are dissatisfied with the consequences of their agreement, 'the time to say so [was] at the bargaining table.'" *Oppenheimer & Co., Inc. v. Oppenheim, Appel, Dixon & Co.*, 636 N.Y.S.2d 734, 738 (N.Y. 1995) (citations omitted). Covad's strained construction of the agreement cannot form the basis for creating ambiguity.

       D.       Covad has Abused the Judicial System by Attempting to Develop a Claim as Opposed to Enforcing a Claim.

Covad's Opposition is further proof that Covad does not have a claim against Revonet. Covad's Complaint is based entirely on the allegation that Revonet's incorporation into its database of (1) data it obtained from Covad and (2) sales leads information it developed on Covad's behalf was a violation of the Date Use Agreement. Through its Motion for Judgment, Revonet has met its burden of showing that the Data Use Agreement expressly authorized all of the conduct alleged in the Complaint, and Covad has failed to prove otherwise.

What Covad's Opposition does show, however, is that Covad, a very large and financially secure telecommunications corporation, abused the judicial process in an attempt to put Revonet, a very small competitor, out of business. Despite Covad's repeated representations to Revonet that it had evidence that Revonet breached the agreement, when asked in discovery to provide the specific basis for Covad's claims that Revonet breached the Data Use Agreement, Covad provided none.

Now, in a desperate attempt to stave off dismissal, Covad argues that even if the conduct complained of in the Complaint was authorized by the very Data Use Agreement it contends was breached, there *might* be another basis for a cause of action. Covad now claims that Revonet **might** have breached the agreement in other undisclosed ways that were not alleged in the Complaint, and that *Revonet* needs to put forth evidence that it did not.

The purpose of the judicial system is to enforce known claims, not to allow litigants a "fishing expedition" in an attempt to create, develop, and identify *potential and unknown* claims through expensive litigation and discovery. Covad's Opposition and discovery responses clearly establish the fact that Covad filed an Eight Million Dollar lawsuit without any basis whatsoever -

conduct that is legally reprehensible.  As a result, Revonet's business has suffered enormously

and Revonet has incurred substantial legal fees and other costs in defending what is a baseless

lawsuit.  The Court should impose sanctions for this egregious conduct as Covad's claim of

misappropriation of trade secrets is made in bad faith.  As a result, Revonet should be awarded

its costs and attorney's fees under § 3426.4 of the California Uniform Trade Secret Act.

Respectfully submitted,

*//S// Jennifer S. Jackman*
Andrew J. Terrell (#431362)
Jennifer J. Jackman (#466922)
Kevin G. Hroblak
Whiteford, Taylor & Preston L.L.P.
1025 Connecticut Ave., NW, #400
Washington, D.C.  20036
(202) 659-6800
(202) 331-0573 (facsimile)

ATTORNEYS FOR DEFENDANT
REVONET, INC.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 1st  day of November, 2007, a copy of the foregoing

was sent via United States mail, postage prepaid to:

John A. Burlingame
Squire, Sanders & Dempsey, LLP
1201 Pennsylvania Avenue, NW
Suite 500
Washington, D.C.  20004

*//S// Jennifer S. Jackman*
Jennifer J. Jackman

*1760562*