UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COVAD COMMUNICATIONS COMPANY, ) ) ) ) | |
| Plaintiff, ) | |
| v. ) | Civil No. 06-1892 (CKK/JMF) |
| ) | |
| REVONET, INC., ) ) | |
| Defendant. ) ) | |

**MEMORANDUM OPINION**

Plaintiff Covad Communications Company ("Covad") brought this action against defendant Revonet, Inc. alleging that Revonet misappropriated and converted confidential, proprietary and trade secret information – namely, sales leads generated by or for Covad – and breached its contract with Revonet. This case was referred to me for management of discovery. Shortly thereafter, plaintiff filed its <u>Motion of Covad Communications Company to Compel Responses to Requests for Production of Documents</u> [#43] ("Pls. Mot.").

### I.   Background.

Covad served its First Set of Requests for Production of Documents, Exhibit A to Pls. Mot. [#43-2] ("Doc. Req."), on April 27, 2007. Pls. Mot. at 2. Revonet responded on June 15, 2007 with a limited number of hard copy documents and represented that "[n]ot all documents have been obtained as Revonet has retained the assistance of an outside consultant to assist in collecting electronic documents . . . other responsive documents will be produced as soon as they become available." <u>Id.</u>  (citing Exhibit B to

Pls. Mot. [#43-3] at 1).  Covad claims that Revonet has not produced any documents since that time.  Id.

On August 4, 2008, Revonet advised Covad that it had additional responsive documents available for inspection and copying.  Exhibit 2 to Revonet's Memorandum in Opposition to Plaintiff's Motion to Compel ("Defs. Opp.") [#46-2] at 2.  Covad apparently never responded to that letter, but instead wrote to Revonet on August 18th and demanded that Revonet produce those documents by August 22nd.  See Exhibit D to Pls. Mot. [#43-5] at 6; Exhibit C to Pls. Mot. [#43-4].  In an August 20, 2008 conference call, Revonet stated that it would make the 35,000 pages of e-mails that are responsive to Covad's request available in hard copy at Revonet's office for inspection and copying.  Pls. Mot. at 4.  Covad took issue with Revonet's offer to produce the documents in hard copy as hard copy is not the documents' native format.  A few weeks later, on September 3, 2008, Revonet offered to make the e-mails available in electronic format as TIFF files, but only on condition that Covad agree to pay for the fees incurred by having one of Revonet's legal assistants delete privileged or otherwise non-responsive documents from the electronic production set.  Exhibit D to Pls. Mot. at 6-7.  Plaintiff objects to the form of defendant's production because printed pages (and TIFF files) are not the native format for e-mails.  Pls. Mot. at 7-10.

Thus, Revonet insists that it be permitted to produce the e-mails in hard copy or as TIFF, provided Covad pays for the necessary deletions.  In other words, Revonet will not produce the e-mails as they were originally created, i.e., in their "native format" as that important term is defined as follows by The Sedona Conference Glossary:

> **Native Format:** Electronic documents have an associated file structure defined by the original creating application. This file structure is referred to as the "native format" of the document. Because viewing or searching documents in the native format may require the original application (for example, viewing a Microsoft Word document may require the Microsoft Word application), documents may be converted to a neutral format as part of the record acquisition or archive process. "Static" formats (often called "imaged formats"), such as TIFF or PDF, are designed to retain an image of the document as it would look viewed in the original creating application but do not allow metadata to be viewed or the document information to be manipulated. In the conversion to static format, the metadata can be processed, preserved and electronically associated with the static format file. However, with technology advancements, tools and applications are becoming increasingly available to allow viewing and searching of documents in their native format, while still preserving all metadata.

The Sedona Conf. Working Group of Elec. Doc. Retention & Prod., <u>The Sedona Glossary: for E-Discovery & Digital Information Management</u> (Conor Crowley & Sherry Harris eds., 2d ed., 2007) at 37, <u>available at</u> http://www.thesedonaconference.org/contentFiles/TSCGlossary_12_07.pdf. Instead, Revonet is claiming the right to convert the e-mails from their native format to other formats even though those are not as easily searchable by electronic means as the e-mails in their native format would be. The question presented is whether Revonet should be permitted to do so when that conversion's only justification is that Covad, according to Revonet, did not specify how the e-mails were to be produced.

## II.   Analysis.

Rule 34 of the Federal Rules of Civil Procedure states that (1) the requesting party may designate the form in which the electronically stored information should be

3

produced, and (2) if the request does not specify, then it should be produced in a form in which it is ordinarily maintained, or in a reasonably usable form.  Fed. R. Civ. P. 34(b)(1)(C), 34(b)(2)(E)(ii).  Thus, as just explained, the parties' view of the preliminary inquiry here is whether Covad designated the form in which the documents should be produced.

Rule 26(f), as amended, specifically requires the parties to discuss the form that production of electronically stored information should take.  Fed. R. Civ. P. 26(f)(3)(C).  This controversy predates that provision, and underscores its importance.  See <u>Aquilar v. Immigration and Customs Enforcement Div. of the U.S. Dep't of Homeland Sec.</u>, No. 07-CV-8224, 2008 WL 5062700, at *8-9 (S.D.N.Y. Nov. 21, 2008) (emphasizing the need for cooperation between counsel in defining the form of production) (citing <u>The Sedona Conference Cooperation Proclamation</u> (2008), available at http://www.thesedona conference.org/dltForm?did=Cooperation_Proclamation.pdf).  It does not appear that Covad and Revonet ever discussed what form this (or any other) production should take.  Instead the parties seem to be making assumptions based on each others' behavior: Covad expecting its documents in electronic form because Revonet hired a company to collect electronically stored information, and Revonet assuming that they should produce 35,000 pages of e-mails in hard copy because Covad produced its documents in that format.  As there is no agreement, the parties invite me turn to to the language of the requests themselves to determine whether Revonet can produce the e-mails other than in their native format.

The instructions to Covad's document requests ask that Revonet "[p]roduce all documents in [its] possession, custody or control, as they are kept in the ordinary course of business, including with all staples and clips attached and with all associated file folders, dividers and labels." Doc. Req. at 3. "Documents" are defined as:

> [A]ny tangible thing upon which any expression, communication, representation or data has been recorded by any means including, but not limited to, handwriting, printing, photostating, photographing, on a computer, instant messages, magnetic impulse, or mechanical or electronic recording and any non-identical copies (whether different from the original because of notes made on such copies, because of indications that said copies were sent to different individuals than were the originals, or because of any other reason), including but not limited to working papers, preliminary, intermediate or final drafts, correspondence, memoranda, charts, notes, records of any sort of meetings, invoices, financial statements, financial calculations, diaries, reports of telephone or other oral conversations, desk calendars, appointment books, audio or video tape recordings, microfilm, microfiche, computer tape, computer disk, computer printout, computer card, and all other writings and recordings of every kind that are in your actual or constructive possession, custody or control.

Doc. Req. at 2.

Thus, I am supposed to determine by examining ancient boilerplate – designed for discovery in a paper universe – such nice questions as whether an e-mail, existing in a computer's memory is a "tangible thing" and how e-mails are "maintained in the ordinary course of business." While I have considered a similar provision in depth once before,[1] I see no need to repeat that metaphysical exercise here because it is a waste of judicial resources to continue to split hairs on an issue that should disappear when lawyers start abiding by their obligations under the amended Federal Rules and talk to each other about

---

[1] See D'Onofrio v. SFX Sports Group, Inc., 247 F.R.D. 43, 47 (D.D.C. 2008).

5

the form of production. I would much prefer to carry out my duties in accordance with Rule 1, which provides that the rules "should be construed and administered to secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1.

More importantly, I do not need to parse words because no one is pretending that Revonet prints all of its e-mails or converts them to TIFF files on a daily basis no matter how ephemeral, meaningless or trivial their content.[2] Therefore, though Covad's instruction is hopelessly imprecise and Revonet could colorably argue that it should be interpreted to include several different formats, no reasonable person can honestly believe that hard copy is one of them. For hard copy to be an acceptable format, one would have to believe that Revonet, in its day to day operations, keeps all of its electronic communications on paper. There is no evidence in the record that Revonet operates in this manner, and no suggestion that such a practice would be anything but incredible. Therefore, even though I can't say I know what Covad *has* asked for, I can say what they have *not* asked for, and that is what they got.

A much more fruitful use of the broad powers I unquestionably have to supervise discovery is to focus on the quickest and cheapest solution to the problem presented. I

---

[2] Note the following remarkable estimate:

> Statistics, extrapolations and counting by Radicati Group from August 2008 estimate the number of emails sent per day (in 2008) to be around 210 billion.
>
> 183 billion messages per day means more than 2 million emails are sent every second. About 70% to 72% of them might be spam and viruses. The genuine emails are sent by around 1.3 billion email users.

Heinz Tschabitscher, How Many Emails are Sent Every Day?, http://email.about.com/od/emailtrivia/f/emails_per_day.htm (last visited December 22, 2008).

will assume that the e-mails at issue exist in what I have called their native format and can be copied onto a CD with a couple of keystrokes. Obviously, printing them or converting them to TIFF files probably (and ironically) costs more so Revonet is hard pressed to claim that producing them now in their native format is unfairly burdensome.

There is one burden, however: the cost of deleting privileged information from the CD to be produced. At one point, Revonet agreed to produce the e-mails in TIFF format but insisted that Covad pay for a paralegal to "manually delete the non-responsive and privileged TIFF's that have already been redacted from the paper document production." Exhibit D to Pls. Mot. at 6. Revonet estimated that this would take the paralegal 5 to 10 hours at a rate of $178.50 for a maximum cost of $1,785.00. Id.

The same paralegal need only take the paper documents that are irrelevant or privileged, find the corresponding "native" e-mails, delete the irrelevant ones and move the privileged ones to another receptacle so they can be logged for a privilege log and made available, if necessary, for my review if the claim of privilege is challenged by Covad. The question then becomes whether Revonet should bear that cost or share it with Covad.

Revonet would have had to incur the cost of privilege review had it produced the e-mails in native format in the first place. That natural burden would not have been shifted because it is presumed that reviewing the data to ascertain whether any of it is privileged must be done by the producing party as a matter of course. Peskoff v. Faber, 251 F.R.D. 59, 61 (D.D.C. 2008) (costs of production should be shifted only if burden is undue because, for example, sources are not reasonably accessible).

Moreover, by converting the data from its native format to TIFF and producing it in hard copy Revonet ran the risk of what has now come to pass—that it would nevertheless have to produce the data in its native format.  Admittedly, the discovery requests antedate the effective date of the amendments to the Federal Rules.  The rules now require the parties to confer about the format of production and to specify how a party is to produce electronically stored information.  But, there was authority in at least 2000 that indicated that a party could be required to produce data in an electronic format even though it had already produced it in hard copy.  See The Honorable Shira A. Scheindlin & Jeffrey Rabkin, Electronic Discovery in Federal Civil Litigation: Is Rule 34 up to the Task? 41 B.C. L. Rev. 327, 355 (2000) (collecting cases[3] differing on whether party could be forced to produce data in electronically stored format after having produced it in hard copy).  Since a moderate amount of legal research would have yielded the cases that are summarized in that article, Revonet's producing the e-mails only in hard copy played with fire.

With justification, Revonet points out that Covad produced its data in hard copy and accepted the first delivery from Revonet in hard copy without protest.  The cases summarized in that article that reach the contrary conclusion—that a party cannot be forced to produce data in electronic format if it has produced it in hard copy[4]—should have given it pause and made it realize that it was playing with the same fire.

---

[3] E.g., Anti-Monopoly, Inc. v. Hasbro, Inc.,  No. 94-CV-2120, 1995 WL 649934, at *1 (S.D.N.Y. Nov. 3, 1995) ("Thus, the rule is clear: production of information in "hard copy" documentary form does not preclude a party from receiving that same information in computerized/electronic form.") (citing Nat'l Union Elec. Corp. v. Matsushita Elec.Co., 494 F. Supp. 1257, 1261 (E.D. Pa. 1980)).

[4] E.g., Williams v. Owens-Illinois, Inc., 665 F.2d 918, 932-933 (9th Cir. 1982), cert. denied, 459 U.S. 971 (1982).  Accord Torrington Co. v. United States, No. 91-08-00568, 1992 WL 40699 at *2 (Ct. Int'l Trade

Since both parties went through the same stop sign, it appears to me that they both should pay for the crash. I will require them to share the cost of the paralegal removing the privileged e-mails, as I have described it, to a cost of no greater than $4,000, i.e., $2,000 each. I expect Revonet to keep a careful record of the time spent and to alert me if there is any risk that the cost will exceed $4,000. At that point (which I hope will not be reached) I will ask Revonet to estimate what it will cost to finish the job and seek the views of counsel as how to cover it.

Finally, I would hope that my decision will have a didactic purpose. This whole controversy could have been eliminated had Covad asked for the data in native format in the first place or had Revonet asked Covad in what format it wanted the data before it presumed that it was not native. Two thousand dollars is not a bad price for the lesson that the courts have reached the limits of their patience with having to resolve electronic discovery controversies that are expensive, time consuming and so easily avoided by the lawyers' conferring with each other on such a fundamental question as the format of their productions of electronically stored information.

### III.   Conclusion.

For the foregoing reasons, Revonet will be directed to produce the e-mails that are the subject of this motion in their native format. Revonet shall also keep track of the amount of time it takes to delete the privileged e-mails and bill Covad for one half those expenses, provided one half does not exceed $2,000.

---

Feb. 21, 1992)); Malone v. Ford Motor Co., No. 12539, 1992 WL 885097 at *2-3 (Va. Cir. Ct. Dec. 31, 1992).

An Order accompanies this Memorandum Opinion.

Date:   December 24, 2008                    /S/
                                             JOHN M. FACCIOLA
                                             UNITED STATES MAGISTRATE JUDGE